**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KEVIN AYRES, *et al.*,                                )<br>                                                               )<br>        Plaintiffs,                                       )<br>                                                               )<br>v.                                                            )<br>                                                               )<br>THE ISLAMIC REPUBLIC OF IRAN,        )<br>                                                               )<br>        Defendant.                                       )<br>_____ ) | Case No.: 1:18-cv-00265 (RCL) |

**REPORT OF SPECIAL MASTER**
**RE: MICHAEL B. OROSS**

Former Air Force Sergeant Michael Brian Oross brings this action under 28 U.S.C.

§ 1605A(c), seeking damages for injuries sustained as a result of the bombing of the United

States Marine headquarters building in Beirut on October 23, 1983.  Pursuant to the

Administrative Plan Governing Special Masters and Federal Rule of Civil Procedure 53, the

Special Master has reviewed testimonial and documentary evidence to assist in determining any

damages to which SGT Oross may be entitled.

**BACKGROUND**

Shortly after dawn on October 23, 1983, a Mercedes truck filled with 2,500 pounds of

explosives broke through a series of steel fences and sandbag barricades, ripping through the

heart of the Marines' administrative headquarters building.  Nicknamed the BLT, the building

housed nearly 400 members of Battalion Landing Team 1/8 and other attached Marines, sailors,

and soldiers.  The detonation was so powerful it lifted the building in the air, sheared off its steel-

reinforced concrete support columns (each 15 feet in circumference), and collapsed the structure

in a matter of seconds, leaving a crater 30 feet deep and 40 feet wide.  The explosion killed 241

servicemen and wounded 81 others, representing the deadliest single-day death toll for the

United States Marine Corps since the Battle of Iwo Jima and the deadliest single-day death toll

for the United States military since January 21, 1968—the first day of the Vietnam War's Tet

Offensive.  The Beirut bombing remains the deadliest post-World War II attack on Americans

overseas.

The events of that day and its aftermath have been amply chronicled and will not be

repeated except as necessary to assess individual damages.  *See, e.g.*, DOD COMMISSION ON

BEIRUT INTERNATIONAL AIRPORT (BIA)TERRORIST ACT OF 23 OCTOBER 1983 (December 20,

1983) ("Commission Report"); Jennifer K. Elsea, Cong. Research Serv., RL31258, SUITS

AGAINST TERRORIST STATES BY VICTIMS OF TERRORISM (August 8, 2008); Michael Petit,

PEACEKEEPERS AT WAR: A MARINE'S ACCOUNT OF THE BEIRUT CATASTROPHE (1986); Timothy

J. Geraghty, PEACEKEEPERS AT WAR: BEIRUT 1983—THE MARINE COMMANDER TELLS HIS

STORY (2009); Glenn E. Dolphin, 24 MAU 1983: A MARINE LOOKS BACK AT THE PEACEKEEPING

MISSION TO BEIRUT, LEBANON (2005); Eric Hammel, THE ROOT: THE MARINES IN BEIRUT

AUGUST 1982-FEBRUARY 1984 (1999).  Similarly, the historical overview of the statutory

scheme under which actions against the Islamic Republic of Iran have been mounted has been

recounted in multiple opinions of this Court, *see*, *e.g.*, *In re: Islamic Republic of Iran Terrorism

Litigation*, 659 F. Supp. 2d 31 (D.D.C. 2009), while the FSIA's procedural guidelines have been

examined in cases such as *Valore v. Islamic Republic of Iran,* 700 F. Supp. 2d 52 (D.D.C. 2010).

## PROCEDURAL HISTORY

Plaintiffs sued the Islamic Republic of Iran on February 5, 2018, under the Foreign

Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, seeking redress for pain and suffering,

intentional infliction of emotional distress, loss of solatium, and economic loss.  ECF No. 1.  On

June 20, 2018, service was effected through diplomatic channels.  ECF No. 12.  Defendant's failure to respond prompted plaintiffs to request the Clerk of Court enter a default on August 23, 2018. ECF No. 13.  The Clerk did so on September 6, 2018.  ECF No. 14.

On May 29, 2019, plaintiffs moved for Default Judgment as to Liability, asking the Court to take judicial notice of the decisions in *Peterson, et al. v. Islamic Republic of Iran*, *et al.*, Civ. No. 01-02094 (RCL) (D.D.C.) and *Boulos, et al. v. Islamic Republic of Iran, et al.*, Civ. No. 01-02684 (RCL) (D.D.C).  ECF No. 15.  Plaintiffs simultaneously moved to appoint the undersigned to the position of special master to consider all issues regarding compensatory damages.  *Id*.  On February 3, 2020, this Court found defendant liable and appointed the undersigned in accordance with Fed. R. Civ. P. 53 and the Administrative Plan Governing Special Masters.  ECF Nos. 19, 20.

## EVIDENCE SUBMITTED IN SUPPORT OF CLAIMS

In support of his prayer for relief, Michael Oross provided testimonial evidence in the form of a declaration dated July 9, 2020 ("MO-Decl.").  Michael also supplied a copy of his Certificate of Release or Discharge from Active Duty ("DD-214"); a Department of Veterans Affairs ("VA") letter, dated April 20, 2017 ("VA Letter"); and responses to an Economic Questionnaire.  Michael is not seeking economic damages.

Relevant information gleaned from these submissions is summarized below.

**Michael Brian Oross**

Michael Oross was born in New York in 1961 and, at all relevant times has been a U.S. citizen.  MO-Decl. ¶ 2.  He enlisted in the Air Force in June 1980, and on October 23, 1983, "was called to report as soon as possible to Rhein Main Air Force Base ["Rhein AB"]," where he served as the Non-Commissioned Officer in Charge of "Biomedical Equipment Maintenance."

*Id*. ¶ 5.  Following the October 23 terrorist attack, Rhein AB was "instrumental in processing of the casualties from the Beirut Barracks bombing in the days and weeks following the blast." https://en.wikipedia.org/wiki/Rhein-Main_Air_Base (last visited on June 23, 2021)).

Michael was told to prepare "for handling casualties from the Marine Barracks Bombing."  MO-Decl. ¶ 5.  Despite an initial estimate of "6-10 casualties," Michael "spent every day from October 24, 1983 until November 10, 1983 handling the remains of the 241 U.S. Servicemen" killed in the bombing—an experience that has "significantly impacted" the quality of his life.  *Id*. ¶¶ 6, 7.  And although Michael did his "best to cope with so much death," he professes to have lost the "illusion of safety" and the "meaning in life."  *Id.*

To this day, Michael "will not talk about the conditions [he] worked under to identify the remains because [he] would never want anyone to picture those servicemen that way."  MO-Decl. ¶ 8.  He feels as if he's "carrying a dark secret that makes [him] feel like an outsider everywhere [he] go[es]."  *Id*.  Michael does recount spending "weeks" wearing surgical masks treated "with overpowering mint or orange scent" to "mask the smell of the remains"—a procedure he blames for his loss of "much of a sense of smell or taste" and the "terrible flashbacks" he experiences when he encounters the scent of orange or mint.  *Id*. ¶ 9.  According to Michael, he can no longer "eat anything with bones and avoid[s] the meat aisle of the supermarket."  *Id*. ¶ 10.

Michael believes his personality "changed" as a result of his participation in the identification and processing effort.  MO-Decl. ¶ 11.  He has since "lost many friends" due to his "bitterness, withdrawal and anger at the senseless deaths and the lack of effective retribution." *Id*.  He feels "isolate[ed]," suffers from insomnia, has "difficulties being in public," "avoid[s] crowds," has "quit many jobs," and has "trouble trusting authority."  *Id*. ¶¶ 13-15.

Michael takes "Zoloft, Wellbutrin, and a supplemental dose of Buspar" to help regulate his "anxiety and mood" and claims the VA has given him a 30% disability rating for PTSD. *Id.* ¶ 17. The VA Letter Michael produced confirms a 30% disability rating but specifies neither the disability nor its cause.

Michael "sought and got counseling" at his "own expense" until he "was able to get into the VA for treatment which took years after realizing [he] had a problem." *Id.* ¶ 18. He started therapy at the VA in 2013 and was still undergoing treatment at the time he executed his declaration. *Id.* ¶ 22. Before then, Michael "self-medicated" and "lived in denial." *Id.* ¶ 23. He attributes his daily headaches, the fact he grinds his teeth, and his painful jaw to PTSD. *Id.* ¶ 19. Michael also has "trouble with triggers"—events that cause him to "break into a cold sweat, zone out or leave the area at that time." *Id.* ¶ 20. He professes to get "sick every Sunday with stress and know[s] it has to do with being called in on a Sunday to set-up for and start the identification process." *Id.*

At the time of the bombing, Michael was married. MO-Decl. ¶ 21. According to Michael, that relationship ended in "divorce years later"—a situation he ascribes to his "becom[ing] more withdrawn" after the bombing. *Id.* Michael remarried in 1996 and has three children. *Id.* ¶ 22. Michael regrets being "emotional[ly] detached" from his family and unable "to form strong relationships with anybody," including his children. *Id.* He has been estranged for "20 plus years" from his parents, brothers, aunts, and uncles. *Id.* ¶ 23. Michael "feel[s] disconnected and empty most days" and performs tasks on "auto-pilot." *Id.* ¶ 24. He is haunted by flashbacks of "handling those remains" and is riddled with guilt that his life has continued. *Id.* ¶ 25. Michael often believes the deceased "would have done more and better with their lives than [he] did with [his]." *Id.*

Michael maintains he "suffered serious injuries as a result of the October 23, 1983 terrorist bombing of the Marine barracks building in Beirut, Lebanon that continue to affect [him] to this day." MO-Decl. ¶ 4. These injuries include "but are not limited to, posttraumatic stress disorder resulting in extraordinary, mental anguish, and emotional distress." *Id.*

## ANALYSIS

Upon review of the testimonial and documentary evidence presented and given the legal framework set out below, the Special Master considers the viability of Michael Oross' claim and the measure of any award of damages. Before doing so, however, some preliminary observations are in order.

## Standard of Proof

To "obtain damages against defendants in an FSIA action, the plaintiff must prove that the consequences of the defendants' conduct were 'reasonably certain (i.e., more likely than not) to occur, and must prove the amount of the damages by a reasonable estimate consistent with this [Circuit's] application of the American rule on damages.'" *Salazar v. Islamic Republic of Iran,* 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005)) (quoting *Hill v. Republic of Iraq*, 328 F.3d 680, 681 (D.C. Cir. 2003)).

As default winners under the FSIA, plaintiffs "must prove damages 'in the same manner and to the same extent as any other default winner.'" *Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 242-243 (D.D.C. 2012) (quoting *Wachsman v. Islamic Republic of Iran*, 603 F. Supp. 2d 148, 160 (D.D.C. 2009)). When assessing these claims, courts in this jurisdiction carve a "'clear distinction' in the standard of proof necessary to establish a plaintiff's *entitlement* to damages and to assess the *amount* of those damages." *Rhodes v. United States*, 967 F. Supp. 2d 246, 313 (D.D.C. 2013) (emphases in original) (quoting *Story Parchment Co. v. Paterson*

*Parchment Paper Co.*, 282 U.S. 555, 562 (1931)).

For future damages, courts require a plaintiff demonstrate entitlement to a "reasonable certainty" or by a preponderance of the evidence and prove damages by a "reasonable estimate." *Hill*, 328 F.3d at 684.  For past loss, a plaintiff must "prove the *fact* of injury with reasonable certainty," *Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1235 (D.C. Cir. 1997) (emphasis added), yet need only "reasonably prove" the amount of damages.  *Hill*, 328 F.3d at 684.

## Pain and Suffering

To determine the appropriate damages to recommend for Michael Oross, the Special Master is informed by prior decisions, mindful of the "challenge aris[ing] in assigning a dollar value to such pain and suffering," *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 163 (D.D.C. 2017), and cognizant of the principle that "there is no exact comparison, and, indeed, strict application of precedent could lead to conflicting conclusions about an appropriate award." *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 57 (D.D.C. 2009).  And while "it is 'undeniably difficult' to assess the amount of compensatory damages for the pain and suffering of surviving victims of terrorist attacks, especially where severe mental anguish is involved," *id.,* (*quoting Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 59 (D.D.C. 2006)), Special Master is constrained to "not simply [recommend] what [he] abstractly finds to be fair," *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 23 (D.D.C. 2002), but to "look at damage awards for pain and suffering in other cases brought under the FSIA," *id*., without losing sight of the "individual circumstances of each victim."  *Goldstein v. Islamic Republic of Iran*, No. 16-cv-2507 (CRC), 2019 WL 2189470, at *6 (D.D.C. March 15, 2019).  *Id.*

The numerous FSIA cases adjudicated in this jurisdiction have resulted in a widely

accepted framework for considering damages under 28 U.S.C. § 1605A. "[W]hen assessing damages for surviving victims of terrorist hostilities," the "baseline assumption" is that "'persons suffering injuries in terrorist attacks are entitled to $5 million in damages.'" *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 35 (D.D.C. 2016) (quoting *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 12 (D.D.C. 2012)). Recognizing the limitations inherent in any "baseline," especially when considering the countless unique injury permutations, our courts have proposed upward departures in the presence of more severe instances, *Valore*, 700 F. Supp. 2d at 84, and downward departures for less grave injuries. *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 112 (D.D.C. 2000).

Finally, to those servicemen suffering mental but no physical injury, courts typically award $1.5 million on the presumption that survivors of terror suffer "lasting and severe psychological problems." *Relvas v. Islamic Republic of Iran*, No. 14-cv-1752 (RCL), 2018 WL 1092445, at *2 (D.D.C. Feb. 28, 2018) (*quoting Estate of Doe v. Islamic Republic of Iran*, 943 F. Supp. 2d 180, 188 (D.D.C. 2013)). *See Wamai v. Republic of Sudan*, 60 F. Supp. 3d 84, 92 (D.D.C. 2014), *aff'd in part, vacated in part on other grounds sub nom.*, *Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017) ("Many plaintiffs suffered little physical injury—or none at all—but have claims based on severe emotional injuries because they were at the scene during the bombings or because they were involved in the extensive recovery efforts immediately thereafter. Those plaintiffs will be awarded $1.5 million."). As with damage awards for physical injuries, this baseline is malleable depending on the evidence and can be enhanced "where a survivor presents with a profound set of documented ailments resulting from their experience," *Relvas*, 2018 WL 1092445 at *2, or reduced where a claimant "failed to capture the emotional impact the [terrorist] attack had on him and his family except in broad

generalizations." *Kaplan*, 213 F. Supp. 3d at 37.

Against this backdrop, the Special Master reviews Michael Oross' claim for pain and suffering.

Michael was not present in Beirut at the time of the bombing and did not participate in the search, rescue, and recovery efforts following the attack. He was stationed in Frankfurt, Germany, when the Marine barracks was leveled, and his prayer for relief is grounded on the psychological damage he suffered after spending weeks sorting and identifying the remains of those slaughtered in the attack. As a general rule, our courts recognize and redress claims for severe and lasting psychological harm brought by those who were present at the bombing or participated in the search, rescue, and recovery efforts initiated in its aftermath. *See Wamai*, 60 F. Supp. 3d at 92.

Theoretically, Michael Oross might be an exception to these temporal and geographical requirements. His failure to provide a modicum of evidence to support his claim, however, forecloses him from recovery.

The "intent" behind all terrorist bombings is "to create maximum emotional impact, particularly on third parties, is terrorism's *raison d'etre*." *Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 27 (D.D.C. 2009). "Proximate causation," the standard governing claims brought under the FSIA, *see In re Islamic Republic of Iran Terrorism Litig*., 659 F. Supp. 2d at 42, "exists so long as there is 'some reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered.'" *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 64 (2010) (quoting *Brewer*, 664 F. Supp. 2d at 54). One of the foreseeable consequences of the Marine Barracks bombing was the carnage and horror faced by those servicemen who would participate in the recovery efforts. In addition to those directly

involved, a few faced the unenviable task of sorting through the remains of that carnage in a remote location.  Some of those individuals were stationed in Rhein Air Base.

While Michael's description of the identification process is non-existent, the sorting and identification process is graphically described by then-Mass Casualty Officer at Rhein AFB Lt. Bonnie J. Tierney (Ret).  Lt. Tierney recounts:

> Imagine walking into a circus tent and seeing hundreds and hundreds of body bags lying on the floor. That's exactly what it reminded me of…a circus tent. Day after day the doctors worked to identify the soldiers. We transported bodies to the medical tables and transported them back to refrigeration trucks. We placed tags on those who were identified, cleaned the body parts from the sand and debris and placed their remains in stainless coffins, bright shiny coffins. One by one, they were moved to different sections in the tent. Then the doctors would find the remains of a person who was already identified and we would return those parts to the coffins. It was some sight to behold.

Tierney, Bonnie J., LOCKED IN TIME—I STILL REMEMBER AND ALWAYS WILL, Outskirts Press, Inc. 2007, at 27-28.

Whether Michael shared similar experiences is an open question given his failure to supply any detail.  A similarly open question is whether Michael's 30% disability rating was for PTSD or another injury incurred during service.  Finally, it is unclear whether the reason for Michael's disability bears any causal connection to his "handling the remains of the 241 U.S. Servicemen."  While Michael's hesitation to "talk about the conditions [he] worked under to identify the remains" may be understandable, his failure to provide any corroborating evidence is not.  By his own admission, Michael "sought and got counseling" at his "own expense" until he "was able to get into the VA for treatment. . . ."  And for seven years, Michael claims to have been in therapy at the VA.  Medical records generated during these years of sessions are readily available, and yet none were produced.  The VA Letter, without more, is of no assistance as it specifies neither the reason for the rating nor establishes a nexus to the events that transpired between October 24, 1983 until November 10, 1983.  Existing VA protocol requires a

psychiatric examination be administered by a licensed professional before a service-connected disability rating for mental illness be assigned. Yet, copies of that examination, again readily available, are not in evidence.

It is settled that "both medical records and the sworn testimony of the injured person and the family members are relevant and may be relied upon in determining an appropriate award." *Goldstein*, 2019 WL 2189470 at *7 (citing *Bluth v Islamic Republic of Iran*, 203 F. Supp. 3d 1, 23 (D.D.C. 2016)).  Michael provides neither.  And unlike servicemen stationed in Beirut at the time of the attack or who participated in the search, rescue, and recovery initiative, Michael is entitled to no presumption of "lasting and severe psychological problems."  *Relvas*, 2018 WL 1092445, at *2.  In short, he has neither "prove[n] the fact of injury with reasonable certainty," *Samaritan Inns, Inc.*, 114 F.3d at 1235, nor "reasonably prove[n]" the amount of damages.  *Hill*, 328 F.3d at 684.

## CONCLUSION

For these reasons, the Special Master recommends that Michael Oross's claim for pain and suffering damages be denied.

Dated:  February 14, 2022                                    Respectfully submitted,


                                                        By:*/s/ Alan L. Balaran*
                                                        Alan L. Balaran, Esq.
                                                        Special Master