## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **KEVIN AYRES**, *et al.*, ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No. 1:18-cv-00265-RCL** |
| ) | |
| **THE ISLAMIC REPUBLIC OF IRAN,** ) | |
| ) | |
| **Defendant.** ) | |

## AMENDED MEMORANDUM OPINION

### I.    LIABILITY

This civil action was brought under 28 U.S.C. § 1605A and arises out of the bombing of the United States Marine barracks in Beirut, Lebanon on October 23, 1983.  Compl., ECF No. 1. Filed on February 5, 2018, the complaint was brought by servicemen killed or injured in the terrorist attack, their estates, and family members.  Defendant was served through diplomatic channels on June 20, 2018.  ECF No. 12.  Following defendant's failure to answer, and upon affidavit by plaintiffs' counsel, the clerk of court entered a default on September 6, 2018.  ECF Nos. 13 & 14.

On May 29, 2019, plaintiffs filed for default judgment, asking this Court to "take judicial notice of all of the findings of fact and conclusions of law contained in the Court's May 30, 2003 Memorandum Opinion entered in the related cases" of *Peterson v. Islamic Republic of Iran*, No. 1:01-cv-2094 (RCL) (D.D.C. May 30, 2003), and *Boulos v. Islamic Republic of Iran*, No. 1:01-cv-2684 (RCL) (D.D.C. May 30, 2003).  ECF No. 15.  Plaintiffs also moved to appoint a special master.  *Id.*  This Court granted both requests on February 3, 2020.  ECF No. 19.

## II.   DAMAGES

Damages available under the FSIA "include economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). Eligible survivors may recover for their pain and suffering; estates of the deceased may recover economic losses; family members may recover solatium for their emotional injury; and all plaintiffs may recover punitive damages. *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 82–83 (D.D.C. 2010).

Under the FSIA, a "default winner must prove damages 'in the same manner and to the same extent' as any other default winner." *Hill v. Republic of Iraq*, 328 F.3d 680, 683–84 (D.C. Cir. 2003) (quoting *Alameda v. Sec'y of Health, Educ. & Welfare*, 622 F.2d 1044, 1048 (1st Cir. 1980)). Each "must prove that the consequences of the defendant['s] conduct were 'reasonably certain (i.e., more likely than not) to occur, and must prove the amount of the damages by a reasonable estimate consistent with this [Circuit's] application of the American rule on damages.'" *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005) (internal quotations omitted) (quoting *Hill*, 328 F.3d at 681). Plaintiffs in this action have amply demonstrated that defendant's commission of acts of extrajudicial killing and provision of material support and resources for such killing were reasonably certain to—and, indeed, intended to—cause injury to plaintiffs. *See Peterson v. Islamic Republic of Iran* (*Peterson II*), 515 F. Supp. 2d 25, 37 (D.D.C. 2007).

Apropos of damage awards, the Court has received and reviewed the recommendations of the special master and **ADOPTS**, without discussion, all facts found and recommendations made that conform to the well-established damages frameworks articulated below. *See Peterson II*, at 52–53; *Valore*, 700 F. Supp. 2d at 84–87. The Court will, however, discuss those instances where the special master has recommended awards deviating from these frameworks. The Court

will also address those instances where plaintiffs filed objections to the special master's recommendations.

    A.    <u>Pain and Suffering</u>

Assessing damages for physical injury or mental disability implicates a myriad of factors. Where "death was instantaneous there can be no recovery . . . ." *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 112 (D.D.C. 2000) (citation omitted); *see also Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 39 n.4 (D.D.C. 2016) (where plaintiffs "submit[] no evidence . . . showing that either of the [v]ictims suffered any pain and suffering prior to their deaths in the suicide bombings," damages must be denied). Victims who survived a few minutes to a few hours after the bombing typically receive an award of $1 million. *Elahi*, 124 F. Supp. 2d at 113.

For victims surviving for a longer period of time, courts balance "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *Peterson II*, 515 F. Supp. 2d at 52 n.26 (citing *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 59 (D.D.C. 2006)). In *Peterson II*, this Court adopted a general procedure for calculating damages that begins with the baseline assumption that persons suffering substantial physical injuries in terrorist attacks are entitled to $5 million in compensatory damages. *Id.* at 54. This approach is not rigidly applied, however, and this Court will "depart upward from this baseline to $7.5–$12 million in more severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead," *Valore*, 700 F. Supp. 2d at 84, and will "depart downward to $2–$3 million where victims suffered only minor shrapnel injuries or minor injury from small-arms fire." *O'Brien v. Islamic Republic of Iran*, 853 F. Supp. 2d 44, 47 (D.D.C. 2012) (citation and internal quotation marks

omitted). And for servicemen suffering emotional but no physical injury, this Court has adopted a general framework for calculating pain and suffering damages whereby they are "typically awarded . . . $1.5 million." *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 12 (D.D.C. 2012) (citations omitted).

The following represents instances where the special master's recommended awards for pain and suffering damages do not comport with the frameworks articulated above and where plaintiffs objected to the special master's recommendations.

        1.    <u>Upward Departures</u>

        *(a)*    *William C. Kilgore, Jr.*

The special master recommended William Kilgore, Jr. receive an enhancement of $500,000 to the $1.5 million typically awarded victims who "suffer[ed] severe emotional injury without physical injury." *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 36 (D.D.C. 2016) (citing *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 49 (D.D.C. 2012)). Report of Special Master re: William C. Kilgore, Jr., ECF No. 46 at 10.

Mr. Kilgore was tasked with helping the FBI and the NIS search for bomb parts and other evidence that might unearth the identity of those responsible for the attack. He was also directed to "sift through the crater and sand to recover any bodies or body parts"—a task he performed under the blazing sun surrounded by the "smell of death" while taking on sniper fire. At one point, Mr. Kilgore uncovered the disembodied head of a fellow Marine.

Following his experience in Beirut, Mr. Kilgore was diagnosed with "Post-traumatic stress disorder, unspecified" and "Major Depressive Disorder, recurrent, moderate"—a mood disorder characterized both by persistent and pervasive loss of interest in all or most previously enjoyable activities and by "vegetative symptoms" that include low self-esteem, hopelessness for the future,

and suicidal thoughts.   He underwent five years of therapy, which included "psychopharmacological treatment as well as various modalities of talk therapy, including CBT [Cognitive Behavioral Therapy], trauma-focused CBT, and . . . EMDR [Eye Movement Desensitization and Reprocessing]."   During these sessions, Mr. Kilgore expressed feelings of loneliness, guilt, and worthlessness and continued to experience nightmares and "some flashbacks"—conditions that often surfaced after "he ha[d] been with or talk[ed] to one of his Marine buddies or [seen] something on television."   Medical reports confirm that, as of June 2014, Mr. Kilgore had been prescribed no fewer than 14 medications to alleviate his physical ailments and psychological distress.   These records also note the etiology of Mr. Kilgore's condition, attributing his deteriorating mental state and chronic Post-Traumatic Stress Disorder ("PTSD") symptoms "to his experiences while serving for the U.S. Marine Corps in Beirut," specifically, "the bombing which occurred in October 1983" and his role "cleaning up bodies which remained after the bombing incident."

The special master found that, unlike claimants whose compensatory claims for psychological distress rest on self-diagnosed ailments and ambiguous, contradictory, and often inflated accounts bolstered by unannotated Veterans' Affairs ("VA") reports and naked rating percentages, Mr. Kilgore provided three years of detailed medical documentation confirming he has suffered the debilitating effects of PTSD and Major Depressive Disorder for which he has undergone intensive therapy and has been prescribed a regimen of antipsychotic and other medications.

The $1.5 million baseline established by this Court implicitly acknowledges that all survivors of the Beirut massacre are presumed to suffer "lasting and severe psychological problems from the attack." *Estate of Doe v. Islamic Republic of Iran*, 943 F. Supp. 2d 180, 188 (D.D.C.

2013). An enhancement is warranted, however, where a survivor presents with a profound set of documented ailments resulting from their experience. The Court agrees such an enhancement is appropriate and **ADOPTS** the special master's recommendation that William Kilgore be awarded $2 million for pain and suffering.

(b)     *Charles R. Ogle*

The special master recommended Charles Ogle be awarded $2 million for pain and suffering, representing an enhancement of $500,000 from the $1.5 million presumptive baseline established by this Court. Report of Special Master re: Charles R. Ogle and Melanie A. Ogle, ECF No. 57 at 15–16.

Following the blast, Mr. Ogle and his squad were directed to assist with the search, rescue, and recovery efforts. While performing these duties amidst the carnage, he encountered the body parts of fellow Marines strewn everywhere amidst the cries of servicemen hopelessly trapped under immovable concrete slabs.

The special master based his recommendation not only on Mr. Ogle's detailed description of the events leading to his trauma but (1) on medical records describing how he suffered a "stress-induced" heart attack; (2) on VA disability ratings linking his PTSD and other related trauma-induced injuries to his service in Beirut; and (3) to the fact that the ensuing "surgeries, PTSD, migraines, and narcolepsy" led to Mr. Ogle's complete withdrawal from society. The special master observed how Mr. Ogle currently lives by himself in the woods with no neighbors or friends and is unable to sleep unless heavily medicated on "cough syrup, melatonin, Xanax, and whiskey." On this record, the Court agrees that Mr. Ogle's ailments go beyond the normal range of mental disorders that generally inform the established $1.5 million baseline, and **ADOPTS** the special

master's recommendation that Charles Ogle be awarded $2 million in damages for pain and suffering.

(c)   Gary G. Lewis

The special master recommended Gary Lewis receive an enhanced compensatory award of $2 million. Report of Special Master re: Gary G. Lewis, ECF No. 48 at 11–12. Mr. Lewis was among those involved in the recovery effort immediately following the October 23 bombing. His duties included sifting through the bodies and remains of his fallen comrades. Records from the Boston VA Medical Center and the Viera VA Clinic confirm that Mr. Lewis has endured a prolonged battle with PTSD and dysthymia (persistent depressive disorder), panic disorder with agoraphobia, and alcohol abuse as a result of his experience in Beirut. Medical records reflect Mr. Lewis's cyclical moods, anxiety, depression, agoraphobia, inability to tolerate "people/unfamiliar terrain" or leave the house, alcohol binges, flashbacks, and additional "triggers to his own mid-east related trauma." Mr. Lewis's treating physicians believe he is "getting steadily worse," noting that he displayed an "emotional rollercoaster of anxiety, fear, anger at himself, crying spells, agoraphobic isolation" and "feel[ings] like 'they' are coming after him everywhere." Reports from the VA confirm a suicide attempt in January 2014.

As of December 2016, Mr. Lewis has been prescribed at least 18 medications, including antipsychotics, antidepressants, and immune-system suppressants. Doctors at the VA observed Mr. Lewis exhibiting symptoms of "impaired impulse control; inability to establish and maintain effective relationships; unprovoked irritability with periods of violence; difficulty in establishing and maintaining effective work and social relationships; panic attacks more than once a week; anxiety; chronic sleep impairment; depressed mood; mild memory loss; suspiciousness." They

have concluded Mr. Lewis has a "total occupational and social impairment," and believe it unlikely he will ever sustain gainful employment in the "foreseeable future."

The Court concurs with the special master that Mr. Lewis's ailments exceed the normal range of psychological disorders that generally ground a $1.5 million baseline award, and **ADOPTS** the recommendation that Gary Lewis be awarded $2 million in damages for pain and suffering.

     *(d)*  *Eugene Smith*

The special master recommended Eugene Smith be awarded $2 million for pain and suffering—an enhancement of $500,000 from the baseline established by this Court.  Report of Special Master re: Eugene Smith, ECF No. 54 at 11.

Mr. Smith offered a graphic account of the events that transpired following the bombing, describing in vivid detail (1) the difficulties he encountered holding on to the corpses of those killed in the attack; (2) how it took multiple servicemen to move one body in order to prevent the deceased's head from dragging on the ground; and (3) how he and the others stacked rows of corpses.

Rather than limit the description of his psychological injuries to subjective exposition, Mr. Smith supplied (1) ten years of "Consult Requests" and "Progress Notes" from the Fayetteville VA Medical Center; (2) an excerpted copy of a June 15 2012 decision issued by the Board of Veterans' Appeals; and (3) a letter from Edwin D. Hoeper, M.D., his treating psychiatrist at the Goldsboro Psychiatric Clinic.  These records confirm not only that Mr. Smith experiences "intrusive recollections of events in Beirut in 1983 when Marine compound was destroyed," but that he suffers from PTSD, manifesting in flashbacks, hypervigilance, anxiety, and insomnia—a consequence of his "help[ing] remove[] dead bodies from Marine Barracks in Beirut in 1983"—

establishing the required causality between his injuries and his participation in the recovery efforts following the bombing.   Dr. Hoeper diagnosed Mr. Smith with Chronic Major Depression accompanied by symptoms that include frequent nightmares, panic attacks, flashbacks, sleeplessness, intrusive thoughts, hypervigilance, withdrawal, severe (100%) short-term memory impairment, anger, sadness, fear, hallucinations, illusions, depression, fatigue, and suicidal ideation.   Moreover, Dr. Hoeper linked his condition to his witnessing "the injuries and deaths of fellow soldiers and others" and "assist[ing] in the bagging of the dead bodies."

This Court agrees with the special master that Mr. Smith's ailments go beyond the range of psychological injuries that generally inform the $1.5 million baseline award and **ADOPTS** the recommendation that Eugene Smith be awarded compensatory damages of $2 million.

### (e)    Michael Oross

On Monday, February 14, 2022, the special master filed the Report of Special Master re: Michael Oross, ECF No. 52, recommending Mr. Oross's claim be denied due to a lack of medical documentation confirming his stated psychological trauma coupled with a failure to establish a causative link between those injuries and his experience at Rhein AFB in Frankfurt, Germany where Mr. Oross was stationed at the time of the attack.   *Id.* at 9-11.   Rhein AFB was the staging ground chosen by the military for the identification and processing of the remains of those who perished in the Marine Barracks bombing.   Mr. Oross participated in those efforts for 17 days.

Mr. Oross sought reconsideration of the special master's recommendation, submitting, for the first time, 500 pages of medical documentation generated by the VA.   Based on these records, the special master filed an amended report in which he concluded that Mr. Oross not only was entitled to an award redressing his damages but that he receive an enhancement of $500,000.   Am. Report of Special Master re: Michael B. Oross, ECF No. 64 at 5.   The revised recommendation

was based on authenticated reports revealing both persistent psychological injuries and a conclusive nexus between Mr. Oross's activities at Rhein AFB and the severe trauma he subsequently suffered. The special master reasoned an enhancement was warranted due to Mr. Oross's unprecedented exposure to the horrific aftermath of the blast, especially when compared to those servicemen who spent a relatively brief period assisting with recovery effort and were awarded $1.5 million. *See, e.g., Worley v. Islamic Republic of Iran*, No. 1:12-cv-2069 (RCL) (D.D.C. Sept. 22, 2015), ECF No. 54 at 7 (suggesting a $1.5 million award for Mario Vasquez, who dug through the rubble for seven hours, finding bodies and body parts); *Davis*, No. 1:07-cv-1302 (RCL) (D.D.C. Nov. 18, 2010), ECF No. 37 at 4 (suggesting a $1.5 million award for Thomas Hoke, who identified and transported wounded for approximately two days); *Bova v. Islamic Republic of Iran*, No. 1:15-cv-1074 (RCL) (D.D.C. May 31, 2020), ECF No. 88 at 3 (suggesting a $1.5 million award for Alan Opra, who admittedly "worked a little bit on the recovery," during which he encountered pieces of human remains and flesh). For more than two weeks, he handled, processed, and identified the decomposing body parts of his fellow servicemen, resulting in profound cognitive and psychological damage. The special master reasoned that Mr. Oross, who suffered profound cognitive and psychological damage after spending more than two weeks handling, processing, and identifying the decomposing body parts of his fellow servicemen, deserved more.

This Court agrees with the special master that Mr. Oross's experiences and subsequent psychological trauma were unique in their severity and warrant an enhancement to the $1.5 million baseline. The Court **ADOPTS** the recommendation that Michael Oross be awarded compensatory damages in the amount of $2 million.

2.   Downward Departures

(a)   *Kevin R. Ayres*

The special master recommended Kevin Ayres receive a diminished compensatory award of $750,000, representing one-half of the $1.5 million baseline.  Report of Special Master re: Kevin R. Ayres ("Ayres Report"), ECF No. 39 at 16.  In support, the special master cited inconsistencies in Mr. Ayres's description of his participation in the search and rescue initiative, misrepresentations about his disability rating, and a tenuous nexus between the terrorist attack and his asserted injuries.

The special master was troubled by the discrepancies between the account Mr. Ayres gave the VA and that supplied in the declarations supporting the instant plea for damages.  On October 30, 2009, 11 years before the underlying action was filed, Mr. Ayres executed a Statement in Support of his Veteran's Application for Compensation and/or Pension ("Statement in Support") in which he maintained that, for "[a]pproximately two weeks" after the destruction of the Battalion Landing Team ("BLT"), he was "man[ning] the radios" aboard the USS El Paso.  According to his Statement in Support, by the time he returned to shore, those engaged in the recovery efforts "had gotten the bodies and the injured out."  In his declarations supporting his instant prayer for relief, however, Mr. Ayres depicted himself as an active participant in the search, rescue, and recovery initiative who witnessed "dead and crushed bodies and body parts," "detached limbs and guts," and similar horrors.  In addition, the Statement in Support makes no mention of the blackouts, nightmares, suicide attempts, employment difficulties, substance abuse, and startled reactions for which he now seeks redress.  It lists his sole injury was "survivors' guilt, knowing that some of the people that [he] knew had died."

The special master also took issue with Mr. Ayres's representation that the VA rated him as "80 percent disabled (70 percent disabled because of my PTSD and 10 percent disabled because of my Tinnitus) as a result of the Marine Barracks Bombing." Upon closer examination, however, the special master discovered that Mr. Ayres's disability rating for PTSD never rose above 30%. And that rating, according to the VA, bore no connection to the barracks bombing but to Mr. Ayres's receipt of a Combat Action Ribbon, which, in the context of a disability rating, establishes "conclusively the occurrence of an in-service stressor." Ayres Report at 13. In other words, there is no evidence Mr. Ayres's psychological trauma was proximately caused by the events of October 23, 1983.

Under the FSIA, "there is no but-for causation requirement . . . proximate cause is sufficient," *Owens v. Republic of Sudan*, 71 F. Supp. 3d 252, 256 n.2 (D.D.C. 2014) (quoting *Valore*, 700 F. Supp. 2d at 75), and requires only "some reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered." *Estate of Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1, 16 (D.D.C. 2011) (quoting *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128–29 (D.C. Cir. 2004)). Despite this relatively lenient standard, it requires proof that the defendant's actions were a "substantial factor in the sequence of events that led to the plaintiff's injury," and that plaintiff's injury was "reasonably foreseeable or anticipated as a natural consequence of the defendant's conduct." *Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475, 493 (D.D.C. 2021) (quoting *Owens v. Republic of Sudan*, 864 F.3d 751, 794 (D.C. Cir. 2017), *vacated and remanded on other grounds sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020)) (internal quotation marks omitted). The required causal link in this instance is lacking.

With respect to Mr. Ayres's shifting narratives, the special master is charged with reviewing and ascertaining the credibility of statements supporting claims for relief. In that spirit, he "*may* accept plaintiffs' uncontroverted evidence as true." *Lanny J. Davis & Assocs. LLC v. Republic of Equatorial Guinea*, 962 F. Supp. 2d 152, 163 (D.D.C. 2013) (citation omitted) (emphasis added). Here, the evidence is not only refuted, it is inherently contradictory. The special master committed no error when he chose not to accept Mr. Ayres's assertions at face value and conclude that Mr. Ayres had no direct participation in the recovery efforts.

On these findings, the special master analogized Mr. Ayres's situation to that of Al Duncan, a serviceman who neither engaged in the Beirut bombing rescue operation, searched for survivors, nor collected the remains of the blast's victims. For witnessing the debris, overturned vehicles, furniture, and personal effects of lost servicemen, this Court awarded Mr. Duncan $750,000. *See Relvas v. Islamic Republic of Iran*, No. 1:14-cv-01752 (RCL), 2018 WL 1092445, at *3 (D.D.C. Feb. 28, 2018). The identical award was given to Ross Morrison based on testimony that he did not participate in the rescue initiative and only observed its aftermath from a distance. *Id*. at *4.

This Court concurs with the special master's conclusion that a downward departure from the $1.5 million baseline is warranted, and **ADOPTS** the recommendation that Kevin Ayres be awarded $750,000.

### (b)    Megunah Ben Qehath

The special master also recommended a downward departure of $750,000 as compensation for the psychological damages suffered by serviceman Megunah Ben Qehath. Report of Special Master re: Megunah Ben Qehath, ECF No. 53 at 11.

At the time of the blast, Mr. Qehath was posted one mile from the BLT. He was subsequently assigned to a two-week security detail far from the barracks. Mr. Qehath was neither

physically injured nor did he participate in the rescue and recovery operation.  His closest contact with the carnage took place a few days after being relieved of his post when he "could see and smell the aftermath," which "reeked of death and despair."

Mr. Qehath claims his experience "damaged" his life, causing him to suffer an array of psychologically debilitating symptoms that included blaming himself for the October 23 attack, difficulty trusting others, aggression, intimacy problems, and persistent intrusive thoughts about the terrorist attack.  Physicians at the VA diagnosed Mr. Qehath with chronic PTSD and bipolar disorder.

The special master found Mr. Qehath undeserving of the $1.5 million award given to those who emerged from the bombing suffering psychological injuries only.  Focusing on statements Mr. Qehath made to the VA when describing his "most traumatic event," the special master noted that, rather than attribute his trauma to the blast or involvement in its aftermath, Mr. Qehath referred to an incident that took place prior to the bombing.  It appears Mr. Qehath was the only member of his unit who returned enemy sniper fire in derogation of the standing rules of engagement and for which he was almost court-martialed.  Soon after this incident, the BLT was bombed—an act Mr. Qehath believes was undertaken in retaliation for his firing on the enemy. On this evidence, the special master found it more than likely that Mr. Qehath's documented ailments stemmed not from the bombing of the BLT but from the events that took place before the blast.

The Court has reviewed the record and concurs with the special master's finding of a lack of proximate causation between the Marine Barracks bombing and Mr. Qehath's psychological injuries.  The touchstone of proximate causation is the existence of "some reasonable connection between the act . . . of the defendant and the damage which the plaintiff has suffered." *Owens,*

864 F.3d at 794 (quoting *Kilburn*, 376 F.3d at 1128).   It is often explicated "in terms of foreseeability or the scope of the risk created by the predicate conduct." *Flanagan v. Islamic Republic of Iran*, 190 F. Supp. 3d 138, 177 (D.D.C. 2016) (quoting *Paroline v. United States*, 572 U.S. 434, 444 (2014)).   The Court agrees with the special master that it was not "foreseeable" Mr. Qehath would fire on the enemy before the October 23 terrorist attack, face a court-martial, take personal responsibility for the destruction that followed, and suffer psychological trauma as a result.

As noted above, this Court previously found two claimants with a record of similarly detached involvement both during and after the destruction of the BLT deserving of an award of $750,000 in compensatory damages. *See Relvas*, 2018 WL 1092445, at *2.   Accordingly, the Court **ADOPTS** the recommendation that Megunah Ben Qehath be awarded compensatory damages in the amount of $750,000.

### 3.   Denial of Compensatory Damages

#### (a)   *Myron A. Kyle*

The special master recommended Myron Kyle's prayer for compensatory damages be denied.   Report of Special Master re: Myron A. Kyle ("Kyle Report"), ECF No. 47 at 15.   His decision was grounded on the fact that, on October 23, 1983, Mr. Kyle was not in Beirut but training in the Mojave Desert.   He claimed injuries resulting from the October 23 attack based on his relationship with several Combat Engineers who deployed to Beirut in June 1983 and were killed in the blast.   Mr. Kyle deployed to Beirut from "mid-February of 1984" to June 30, 1984, as part of an engineering detail, assisting in the extraction of the Ambassador's family and staff and completing various projects at the embassy compound.   While in Beirut, Mr. Kyle's squad was subjected to "small-arms fire" and faced "increas[ed] security threats."

Mr. Kyle, who did not witness the destruction of the Marine Barracks and participated in none of rescue and recovery efforts, claims the October 23 attack caused him to experience "frightening, irrational thoughts at times which led to anxiety, depression, and hypervigilance." In 2012, almost 30 years after bombing, Mr. Kyle sought help from his local VA. He maintains that in December 2013, the VA "diagnosed [him] with Post-Traumatic Stress Disorder (PTSD) as a result of the terrorist act that occurred on October 23, 1983," and rated him as 70% disabled. The VA Rating Decision supplied in support of his claim confirms a 70% disability rating "for major depressive disorder" related "to military service." Kyle Report at 6. The VA listed Mr. Kyle's symptoms to include "Speech intermittently illogical"; "Speech intermittently irrelevant"; "Speech intermittently obscure"; "Disturbances of motivation and mood"; "Depressed mood"; "Mild memory loss"; and "Suspiciousness," resulting in "Occupational and social impairment due to mild or transient symptoms which decrease work efficiency and ability to perform occupational tasks only during periods of significant stress." *Id.*

Notwithstanding the VA's diagnoses of Mr. Kyle's mental state and symptomology, the special master recommended his claim be denied on the grounds that Mr. Kyle lacked any viable theory of liability under the FSIA and that he failed to demonstrate the requisite nexus between the bombing of the Marine barracks and his deteriorating mental state. The Court agrees.

The FSIA "require[s] plaintiffs to prove a theory of liability" in which plaintiffs articulate a justification for the recovery of the damages which they seek, generally expressed "through the lens of civil tort liability." *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 52 (D.D.C. 2012) (quoting *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 176 (D.D.C. 2010)). Mr. Kyle presses three such theories: assault, battery, and intentional infliction of emotional distress ("IIED"). None survive legal scrutiny.

Liability for assault under the FSIA is established where a defendant "(1) acted 'intending to cause a harmful contact with . . . or an imminent apprehension of such a contact' by, those attacked and (2) those attacked were 'thereby put in such imminent apprehension.'" *Valore*, 700 F. Supp. 2d at 76 (quoting Restatement (Second) of Torts § 21(1)).   Liability for battery is demonstrated where a defendant "acted 'intending to cause a harmful or offensive contact with . . . or an imminent apprehension of such a contact' by, those attacked and . . . 'a harmful contact with' those attacked 'directly or indirectly result[ed].'" *Valore*, 700 F. Supp. 2d at 77 (quoting Restatement (Second) of Torts § 13).   And liability for IIED attaches when "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Heiser v. Islamic Republic of Iran* (*Heiser II*), 659 F. Supp. 2d 20, 26 (D.D.C. 2009) (quoting Restatement (Second) of Torts § 46(1)).   In cases pressing claims for IIED or solatium, our courts have limited the plaintiff class "to a party against whom the extreme and outrageous conduct was not directed if that party is (1) a member of the victim's immediate family and (2) was present at the time of the extreme and outrageous conduct." *Worley*, 75 F. Supp. 3d at 336 (citing *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 75 (D.D.C. 2010)); *see* Restatement (Third) of Torts § 46(2)(a).

The special master concluded that Mr. Kyle's presence in the Mojave Desert at the time of the terrorist attack fatally undercut his claim that he either was the victim of a "harmful or offensive contact" or placed in reasonable apprehension thereof, while the lack of evidence he was an immediate family member of an injured or deceased serviceman, nullified his theory of IIED.

The special master also found a lack of proximate causation between the bombing of the Marine barracks and Mr. Kyle's emotional state 30 years later, concluding the nexus between the events too tenuous to support his claim.

Mr. Kyle objected to the special master's findings, ascribing three errors to the report and recommendation. Objection of Myron Kyle ("Kyle Objection"), ECF No. 61.

*First*, Mr. Kyle maintains the VA report "clearly reflects that it was Plaintiff's experiences related to the October 1983 bombing which were his stressors, and that his deployment in Beirut following the bombing contributed to his mental level of major depression." *Id.* at 2–3.  He insists the VA "found that Mr. Kyle met the criterion for a depressed mood disorder because he (1) directly experienced a traumatic event and (2) learned that the traumatic event of a close family member or close friend where the actual death was violent and he experienced extreme exposure to aversive details of a traumatic event." *Id.*

*Second*, Mr. Kyle faults the special master for paying undue attention to "the fact that the Plaintiff was not present in Beirut at the time of the bombing and did not participate in the search, rescue and/or recovery after the bombing as a basis for not finding the Plaintiff entitled to recover." *Id.* at 3.  Citing *Relvas v. Islamic Republic of Iran*, No. 1:14-cv-01752 (RCL), 2018 WL 1092445 (D.D.C. Feb. 28, 2018) and *Wamai v. Republic of Sudan*, 60 F. Supp. 3d 84 (D.D.C. 2014), Mr. Kyle argues that "entitlement to recovery does not require a victim to be present at the location of the bombing in order to recover for a claim of PTSD." Kyle Objection at 3–4.

*Third*, Mr. Kyle maintains the special master erred when he concluded that a "causal link between his 'current symptomatology and the claimed in-service stressor'" was not established. *Id.* at 4 (quoting Kyle Report at 14).

The Court finds Mr. Kyle's objections to be without merit. It must be noted at the outset that Mr. Kyle did not respond to the special master's observation that he failed "to prove a theory of liability which justifies holding the defendant[] culpable for the injuries that the plaintiffs have allegedly suffered." Kyle Report at 12. Rather, he supported his objections with three exhibits. Exhibit A—a copy of his declaration, dated March 23, 2021; Exhibit B—a letter from the Department of Veterans Affairs, verifying a disability rating of 70% for service-connected "Major depressive disorder" and an explanatory "Rating Decision" dated January 30, 2014; and Exhibit C—a Medical Opinion Disability Benefits Questionnaire ("MO-DBQ") and an Initial PTSD Disability Benefits Questionnaire ("PTSD-DBQ")—standardized forms employed by VA clinicians performing disability, compensation, or pension examinations.

The Court finds Exhibits A and B unsupportive of Mr. Kyle's position. Exhibit A, Mr. Kyle's declaration, is identical to that submitted to the special master and fails to bolster his assertion that being in the same unit several months before the attack with servicemen who perished in Beirut warrants compensatory relief. Exhibit B is similarly unhelpful, as it confirms only that the VA rated Mr. Kyle with a 70% service-connected disability rating with the above-noted symptomology. Unfortunately, neither the VA letter nor the Rating Decision clarify whether Mr. Kyle's compromised mental state was caused by the Marine Barracks bombing, the events that occurred when he was stationed in Beirut between February and June 1984, or an undisclosed incident or event that occurred during his military service. To qualify for VA benefits, a veteran must have (1) evidence of an occurrence or aggravation of a disease or injury in service, (2) a medical diagnosis of a current disability, and (3) a medical nexus between the in-service injury or disease and that disability. 38 U.S.C. § 1110. Under this regime, Mr. Kyle would qualify for VA benefits if he successfully demonstrated the existence of *any* in service incident that resulted in

injury or disease. The FSIA is more restrictive, recognizing only those claims that were "caused by" a terrorist incident. 28 U.S.C. § 1605A(a)(1). If Mr. Kyle's injuries arose out of events that transpired while in Beirut in 1984 or some other incident, his claim would go unredressed. In short, the VA's failure to delineate the precise "injury in service" renders Mr. Kyle's 70% disability rating unavailing in his claim for damages under the FSIA.

Exhibit C warrants further discussion. In the PTSD-DBQ, the VA psychologist overseeing Mr. Kyle's medical examination recorded the two stressors identified by Mr. Kyle as contributing to his depressed state. The first "stressor" occurred,

> [i]n October 1983 when the bombing occurred, [and] Mr. Kyle was in California scheduled to go on a 3 day exercise. He had a small transistor radio. When the bombing occurred, his unit grouped around the radio any time they were able to do so. They knew people who were there and the body count kept climbing. He got through to his mother after 3 days and she was frantic because she didn't know where he was. Back at the barracks it was different because there was a platoon that was not returning and the rest of the platoons were deployed. His unit went to Beirut in February.

ECF No. 61-3 at 14.

The second "stressor" occurred after he

> was deployed to Beirut, [where] the rules of engagement were such that they were not allowed to defend themselves if they felt threatened. They had to call in for permission. His unit did come under fire at times. It was sporadic fire but they mostly hunkered down undercover. They were between where the guns were being fired and where the bullets were hitting. In describing how this affected him, he reported that they were involved in a role play. The guns had blanks in them. When they got off, some people started shooting. He and another marine immediately dropped behind a barricade and returned fire. They were totally shocked because it was an automatic reaction. Mr. Kyle became very tearful while telling this.

Id. at 15.

Based on these and other responses, the VA foreclosed a diagnosis of PTSD and concluded Mr. Kyle was suffering from "Major Depressive Disorder" conforming to the Fourth and Fifth Editions of The Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV" and "DSM-5")—diagnostic and taxonomic guides published by the American Psychiatric Association ("APA").   In his objection, Mr. Kyle appears to focus on the VA psychologist's affirmative response to the question: "Was the Veteran exposed to a traumatic event where he/she experienced, witnessed or was confronted with an event or events that involved actual or threated death or serious injury, or a threat to the physical integrity of self or others? (DSM-IV A 1 Criterion)." ECF No. 61-3 at 14.   Mr. Kyle suggests this affirmation alluding to the threat to "others," conclusively establishes a causative link between the October 23, 1983 attack and his depressed mental state 30 years later and justifies an award of compensatory damages.   Mr. Kyle's position is unsustainable as it erroneously conflates the prerequisites for establishing benefits under VA guidelines with the criteria required of an FSIA claimant to receive compensatory damages.

The DSM Criterion A for PTSD can be satisfied if an individual has been "[e]xpos[ed] to actual or threatened death, serious injury, or sexual violence" through "[l]earning that the traumatic event(s) occurred to a close family member or close friend," and was "violent or accidental." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013). Provided a veteran conforms to the remaining seven DSM-5 criteria, he may be eligible for PTSD benefits upon learning that a "close friend" has been the victim of a violent act.   The standards governing claims for damages brought by victims of terrorist attacks are not as liberal as those governing the Department of Veterans Affairs when assessing the benefits claims of veterans.   Under the FSIA, a "close friend" is not the legal equivalent of a "victim's immediate family" member, *Heiser II*, 659 F. Supp. 2d at 27, and thus lacks standing to pursue compensatory relief.   When adjudicating

terrorist claims, our courts have consistently been mindful of "the realities of tort law and the necessity of limiting recovery to a definable scope of individuals." *Id.* at 29 (quoting *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 36–37 (D.D.C. 2001)). To put this in perspective, were Mr. Kyle a cousin or uncle with close personal ties to one of the Marines killed in Beirut, he would be entitled to no compensatory relief under the FSIA, as our courts have "adopted the strict meaning of 'immediate family,' defined as one's spouse, parents, siblings, and children," *Heiser II*, 659 F. Supp. 2d at 28 (citing *Jenco*, 154 F. Supp. 2d at 38 n.8), and excludes "'near relatives,' 'close associates,' or persons with whom the victim has 'close emotional ties.'" *Valore*, 700 F. Supp. 2d at 78 (quoting *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 336 (D.C. Cir. 2003)). The overbroad construction pressed by Mr. Kyle ignores this distinction and is anathema to our courts' carefully placed limitations.

Beyond this, Mr. Kyle's argument that the special master erred in focusing on Mr. Kyle's lack of presence in Beirut reflects a flawed interpretation of the facts and the law. The seminal issue here is not whether Mr. Kyle was in Beirut at the time of the bombing, but whether he witnessed the terrorist attack or participated in the recovery efforts that followed. His reliance on *Wamai* and *Relvas*, therefore, is misplaced.

In *Wamai*, the court awarded $1.5 million in damages to Edward Mwae Muthama, an employee of the U.S. Embassy in Kenya. Mr. Muthama was working offsite when a bomb exploded, killing 44 American employees and seriously wounding 21 others. The blast also claimed the lives of approximately 200 Kenyans and injured 4,000 nationals. Shortly after the attack, Mr. Muthama headed to the blast site and spent days administering aid to survivors and handling the dead bodies and remains of his murdered colleagues, for which he suffered emotional distress. *Wamai*, 60 F. Supp. 3d at 92. In *Relvas*, the court awarded $750,000 to Al Duncan and

Ross Morrison, neither of whom was in the immediate proximity of the barracks blast. Mr. Duncan "witnessed the actual rubble of the barracks and the first responders that were working there, the overturned vehicles, [and] the levels of the barracks that collapsed," while Mr. Morrison, although not a participant in the rescue operation, viewed the aftermath of the bombing from a distance. *Relvas*, 2018 WL 1092445, at *3–4. Mr. Kyle's experience bears no resemblance to the claimants in either case.

The special master concluded that, without more, Mr. Kyle's sense of outrage and anguish over the tragic loss of military personnel cannot ground a claim under the FSIA. This conclusion is not without precedent. In *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1 (D.D.C. 2018), the court dismissed the claim of serviceman Christopher Galletto. Mr. Galleto was not present when the Khobar Towers housing complex was bombed, yet "felt a tremendous sense of grief and loss" after the attack and had "never come to grips with the loss of three of [his] closest friends on that terrible day." *Id*. at 37 n.12. Observing that Mr. Galletto's IIED theory was unsupported "by the Restatement or by Circuit precedent, or by any decisions by other Judges of this Court," the court reasoned that "'to collect for intentional infliction of emotional distress in cases such as this one, the plaintiff need not be present at the place of outrageous conduct, but must be a member of the victim's immediate family,' or, with 'a slight stretching of the immediate-family requirement,' step-parents of the victim." *Id*. at 37 n.12 (quoting *Heiser II*, 659 F. Supp. 2d at 27, 29).

The rationale in *Akins* applies here with equal force. To hold otherwise and allow Mr. Kyle's suit to proceed would open the floodgates to prospective litigants who were neither exposed to the attack nor involved in any facet of the search, rescue, and recovery effort. Except for those family members deserving of a solatium award, our courts hew to the well-settled principle that "a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person

by the defendant's acts [is] generally said to stand at too remote a distance to recover." *Holmes v. Sec. Inv. Prot. Corp.* 503 U.S. 258, 268–69 (1992). Absent such a restriction, one would be hard-pressed to locate an American civilian, much less a member of the military, who did not anguish over the senseless slaughter of 241 Marines. To allow a forum for every individual so impacted to sue would turn the FSIA on its head. In the final analysis, our courts simply lack the "authority to stretch the law beyond its *clear bounds* to satisfy our sense of justice." *Bettis*, 315 F.3d at 336.

The Court **ADOPTS** the special master's recommendation that Myron Kyle's claim for compensatory damages be denied.

B.    Solatium

This Court developed a standardized approach for FSIA intentional infliction of emotional distress, or solatium, claims in *Heiser v. Islamic Republic of Iran* (*Heiser I*), 466 F. Supp. 2d 229 (D.D.C. 2006). In *Heiser I*, this Court surveyed damages awarded to the family members of the deceased victims of terrorism and determined, based on averages, that "[s]pouses typically receive greater damage awards than parents [or children], who, in turn, typically receive greater awards than siblings." *Id.* at 269. This Court then established a framework whereby spouses of deceased victims receive approximately $8 million, while parents receive $5 million and siblings receive $2.5 million. *Id.*; *see also Valore*, 700 F. Supp. 2d at 85 (observing that courts have "adopted the framework outlined in *Heiser I* as 'an appropriate measure of damages for the family members of victims'" (quoting *Peterson II*, 515 F. Supp. 2d at 51)). When the distress results from injury to a loved one, courts reduce solatium awards to half of the value set out in *Heiser I*—"$4 million, $2.5 million[,] and $1.25 million to spouses, parents, and siblings, respectively." *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 14 (D.D.C. 2012). And when servicemembers receive the baseline of $1.5 million for pain and suffering damages, courts reduce solatium awards further—

"$1 million for spouses, $850,000 for parents, $750,000 for children, and $500,000 for siblings." *Id.* at 16.

When applying this framework, this Court is mindful that "[t]hese numbers . . . are not set in stone," *Murphy*, 740 F. Supp. 2d at 79, and that deviations may be warranted when confronted either with "evidence establishing an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship," "medical proof of severe pain, grief or suffering on behalf of the claimant," or "circumstances surrounding the terrorist attack [that rendered] the suffering particularly more acute or agonizing." *Oveissi*, 768 F. Supp. 2d at 26–27. Conversely, downward departures may be appropriate where the evidence suggests that the relationship between the victim and his family members is attenuated, *Valore*, 700 F. Supp. 2d at 86, or where a claimant fails to "prove damages 'in the same manner and to the same extent' as any other default winner." *Hill*, 328 F.3d at 683 (quoting *Alameda*, 622 F.2d at 1048).

The Court next discusses the one instance where the special master's recommended award for loss of solatium strays from the *Heiser I* framework.

### 1.   Downward Departure

#### (a)   *Isiah J. Young and Chyla D. Young*

Isiah Young's and Chyla Young's claims are derivative to that of their father, Virgil Young, who suffered psychological injuries resulting from his experiences in Beirut and for whom the special master recommended an award of $1.5 million. The special master recommended Chyla Young receive $100,000 and Isiah Young receive $150,000—downward departures from the $750,000 our courts have awarded children of victims receiving $1.5 million in damages for pain and suffering. Report of Special Master re: Virgil T. Young, Jr., Isiah J. Young, and Chyla

D. Young, ECF No. 56 at 20 (citing *O'Brien*, 853 F. Supp. 2d at 47; *Estate of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 157 (D.D.C. 2011)).

The special master recommended reduced awards, questioning the veracity of Isiah's and Chyla's sworn declarations. He found that Isiah and Chyla offered up unusually nuanced and detailed descriptions of events they purportedly witnessed as infants. The special master was particularly troubled that at least six of the twelve substantive paragraphs in their respective declaration were identical. Reasoning that declarations are sworn statements designed to afford the finder of fact insight into the unique set of injuries suffered by individual claimants, the special master found Chyla's and Isiah's plagiarized account of events lacking in credibility. The special master concluded that the baseline awards should be reduced accordingly. And as Isiah was older than Chyla and more likely to comprehend some of the unseemly events that took place in the Young household, the special master recommended he receive the larger of the two awards.

The Young children filed an objection to the special master's report and recommendation, arguing, in the main, that the special master erred by not acknowledging prior decisions where our courts have awarded solatium damages to claimants who were infants when their parents were killed or held hostage. Objection of Isiah J. Young and Chyla D. Young, ECF No. 62 at 3–4. While the Youngs correctly observe that our courts have compensated young children and infants whose parents were victims of terrorism, neither Isiah nor Chyla confronts the special master's credibility concerns, much less his observation that each declaration was little more than a photocopy of the other.

The Court sees no reason to dispute the findings of the special master. As previously stated, when assessing the viability of an FSIA claimant's prayer for relief, the special master *may* rely on "uncontroverted factual allegations" that are "supported by . . . documentary and affidavit

evidence," *Rimkus*, 750 F. Supp. 2d at 171(quoting *Valore*, 700 F. Supp. 2d at 59), and "*may* accept plaintiffs' uncontroverted evidence as true." *Lanny J. Davis & Assocs. LLC*, 962 F. Supp. 2d at 163 (emphasis added).  The special master has chosen not to credit the bulk of the testimony offered by Isiah and Chyla Young and has reduced their awards accordingly. .

The Court **ADOPTS** the special master's recommendation that Isiah Young receive $150,000 and Chyla Young receive $100,000 in compensatory damages for loss of solatium.

C.     Economic Damages

28 U.S.C. § 1605A, like its statutory predecessor 28 U.S.C. § 1605(a)(7), establishes a cause of action for economic damages resulting from an act of state-sponsored terrorism.  In *Estate of Bland*, this Court awarded economic damages for lost wages resulting from injuries suffered in the 1983 Marine Barracks bombing and for loss of accretions to the estates of those killed in the attack.  831 F. Supp. 2d at 156.  Loss of accretion damages "are calculated by estimating a decedent's future earning potential based on the individual's work and education and adjusting that amount to account for inflation, rise in productivity, job advancement, and personal consumption." *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 87 (D.C. 2002) (citing *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 28 (D.D.C. 1998)).

Before authorizing a recovery for economic losses, this Court must be presented with evidence which affords a reasonable basis for measuring the claimant's loss.  Although mathematical exactitude is often impossible, proof of economic losses should be established with reasonable certainty and not grounded in speculation, contingency, or conjecture.

The economic losses sought both by those injured in the terrorist attack and by the estates of those who perished have proven to the satisfaction of the special master, and thus to the satisfaction of this Court, to be valid. *Valore*, 700 F. Supp. 2d at 85.  The one instance the special

master rejected a claim for economic relief was in the case of Myron Kyle, who lacked a sustainable cause of action. As financial losses are derivative claims which presuppose an injury sustainable under the FSIA, the special master correctly recommended Mr. Kyle's claim for pecuniary relief be denied. *See* Kyle Report at 15.

The Court therefore **ADOPTS**, without modification, the special master's recommended damage awards for economic losses.

D.   Punitive Damages

In assessing punitive damages, this Court has observed that any award must balance the concern that "[r]ecurrent awards in case after case arising out of the same facts can financially cripple a defendant, over-punishing the same conduct through repeated awards with little additional deterrent effect," *Murphy*, 740 F. Supp. 2d at 81, against the need to continue to deter "the brutal actions of defendant[] in planning, supporting and aiding the execution of [terrorist attacks]." *Rimkus*, 750 F. Supp. 2d at 184. To further this goal, this Court held that the calculation of punitive damages in subsequent related actions should be tied directly to the ratio of punitive to compensatory damages established in earlier cases. *Murphy*, 740 F. Supp. 2d at 82–83. The ratio of $3.44 was established in *Valore*—an earlier FSIA case arising out of the Beirut bombing. *Id.* (citing *Valore*, 700 F. Supp. 2d at 52). The Court will again apply this same $3.44 ratio, resulting in a total punitive damages award of $252,174,790.00.

### III.   CONCLUSION

This Court acknowledges and appreciates the efforts by plaintiffs to hold Iran accountable for its support of terrorism. The Court concludes that the defendant must be punished to the fullest extent legally possible for the bombing in Beirut on October 23, 1983—a depraved act that destroyed the lives of countless individuals and their families, including the 33 plaintiffs who are

parties to this lawsuit. This Court hopes that the victims and their families may find some measure of solace from this Court's final judgment.

The Court finds defendant responsible for the injuries sustained by the plaintiffs and thus liable under the FSIA's state-sponsored terrorism exception for $73,306,625.00 in compensatory damages and $252,174,790.00 in punitive damages, for a total award of $325,481,415.00.[1]

A separate Order and Judgment consistent with these findings shall be entered this date.

DATE: May 3, 2022

Royce C. Lamberth
United States District Court for the
District of Columbia

---

[1] The Court's previous memorandum opinion, order, and judgment, ECF Nos. 66 & 67, contained clerical errors with respect to these totals. Under Rule 60(a) of the Federal Rules of Civil Procedure, a court "may correct a clerical mistake or a mistake arising from oversight or omission" in a judgment, order, or elsewhere, either by motion or *sua sponte*, "with or without notice." Fed. R. Civ. P. 60(a); *see Howard Sober, Inc. v. Interstate Com. Comm'n*, 628 F.2d 36, 41 (D.C. Cir. 1980). The Court has corrected these totals here and will issue an amended order and judgment accordingly.